**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Jorge Luis ALZATE, Defendant–
Appellant.**

No. 93–4485.

United States Court of Appeals,
Eleventh Circuit.

March 17, 1995.

Hector L. Flores, Asst. Federal Public Defender, James R. Gailey, Federal Public Defender, Miami, FL, for appellant.

Richard D. Boscovich, Alice Ann Burns, Asst. U.S. Attys., Miami, FL, for appellee.

Before KRAVITCH and CARNES, Circuit Judges, and HILL, Senior Circuit Judge.

CARNES, Circuit Judge:

Jorge Luis Alzate was convicted of possessing and importing cocaine, and he has never denied doing it. At trial, his sole defense was duress. On two occasions while evidence was being presented, the prosecutor made certain representations detrimental to Alzate's duress defense. Before the case was submitted to the jury, the prosecutor learned that his representations had been false, but he failed to correct them. Because the prosecutor's failure to correct his false representations could have affected the jury's verdict, we reverse the denial of Alzate's new trial motion.

## I. THE FACTS

The charges against Alzate for possessing and importing cocaine in violation of 21 U.S.C. §§ 841(a)(1), 952(a) and 960(a)(1), (b), and 18 U.S.C. § 2, stem from events that occurred on July 12, 1992. On that date, Alzate disembarked in Miami from a flight originating in Colombia and was caught red-handed with a suitcase containing approximately one kilogram of cocaine. At trial the government presented testimony from the Customs Service Inspector who had discovered the cocaine in Alzate's luggage, and from Special Agent Damon Ostis, who had interviewed Alzate at the airport after his arrest. Their testimony proved that Alzate had knowingly possessed and imported cocaine, something he did not dispute.

### A. Alzate's Duress Issue

Alzate presented a duress defense. Under the law of this circuit, to establish a defense of duress a defendant " 'must show that he acted under an immediate threat of death or serious bodily injury, that he had a well-grounded fear that the threat would be carried out, and that he had no reasonable opportunity to escape or inform [the] police.' " *United States v. Jones,* 32 F.3d 1512, 1515 (11th Cir.1994) (quoting *United States v. Laetividal–Gonzalez,* 939 F.2d 1455, 1465 (11th Cir.1991), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 505 (1992)); *see also United States v. Sixty Acres in Etowah County,* 930 F.2d 857, 860 (11th Cir.1991). Alzate attempted to persuade the jury that men to whom he owed a debt forced him to transport the suitcase containing drugs by threatening immediate harm to Alzate and his family. That was the issue upon which the trial was joined.

Alzate presented three witnesses in support of his duress defense; he was the most important one. In his testimony, Alzate told a tale of woe which had begun years before when he borrowed money to visit his sick son. He testified that in late 1990 two men had given him an airline ticket and lent him some money so that he could travel from the United States, where he had been living for several years, back to his home in Colombia, where his son was very ill. Due to an unex-

pected delay in his return to the United States, and various other family difficulties, he was not able to repay the debt immediately. The men eventually grew impatient and began pressuring Alzate either to pay them the money or to do a job for them by transporting drugs or money to and from the United States. Alzate testified that he successfully evaded these men for a while, but that they caught up with him on a subsequent trip to Colombia. They demanded that he give them any jewelry or other valuables he owned, and when they were dissatisfied with what little Alzate had to offer, they took his passport and green card and told him he would have to swallow drugs to take back to the United States. Alzate testified that with the help of his mother he was able to repay in full the amount he owed. Nonetheless, he was later told that he still owed the money because the man to whom he had given the money had disappeared. It was at that point, Alzate said, that the men started threatening his sister, with whom he had been staying in Colombia.

Alzate testified that on the night of July 11, 1992, three men came to pick him up. They packed his clothes inside of a suitcase they had brought along, they took him to a strange apartment for the night, and the next morning they took him to the airport and put him on a plane. Alzate did not know exactly what was in the lining of the suitcase, but he admitted he thought it probably was something illegal, because the men never made him swallow any drugs. Alzate said that on the way to the airport one of the men had a gun pointed at him and told him that if he tried to do anything "brave," they would get his children and his sister's children. A few days before these events Alzate's sister had received a "sufragio," which is a sympathy card usually sent to a family after someone dies. He testified that if a sufragio is sent when no one has died, it is a death threat. Alzate did not tell officials in Colombia or the United States about his predicament, he explained, because he was afraid for the lives of his children and other relatives still in Colombia.

Blanca Agudelo, Alzate's mother, testified next for the defense. She stated that she had been present in Colombia on one occasion when four men came looking for her son; her description of the event corroborated Alzate's testimony on direct examination. Agudelo testified that she was informed that her son's life was in danger. She related efforts she had made to help her son repay the debt: she had borrowed $2,000 and given it to Alzate to repay the debt, and when the men still did not release his debt, she offered them a video camera and another $700 in cash. Agudelo explained that she did not tell the authorities because she was afraid for her son's life.

The final defense witness was Carlos Orozco, a friend of the family who had been staying with Alzate's mother in New Jersey. Orozco testified that he became aware of Alzate's problem with the debt just before Alzate left for Colombia in 1991. He said he had tried to help by loaning Alzate's mother $700, and by offering a used car to one of the men to whom Alzate was indebted. Orozco also testified that Alzate's mother told him the day before Alzate arrived in Miami that Alzate would be coming home the next day.

### B. The Dispute Over Alzate's Statement to Agent Ostis

One of the chief obstacles to Alzate's duress defense was the testimony of Agent Ostis about a statement Alzate had made while Ostis was interviewing him at the Miami airport, shortly after his arrest. During the government's case-in-chief, Ostis testified that, upon questioning, Alzate said he had been paid $8,000 for transporting the cocaine, and that he needed the money for his family and to repay a debt. The government's position was that that statement, and not Alzate's testimony at trial, was the truth.

The defense strategy was to explain Agent Ostis's testimony about the statement as a misunderstanding due to a language problem between Agent Ostis and Alzate. The defense had something to work with in this regard, because Agent Ostis acknowledged that: Alzate was given a Spanish language *Miranda* form; Ostis spoke very little Spanish; yet, Ostis interviewed Alzate without an interpreter. Alzate testified that he had difficulty with English and, for that reason, he

and Agent Ostis had problems communicating.

The position of the defense was that Alzate had thought that Agent Ostis's question had been about another box of cocaine in the room where Alzate was being questioned. Alzate had been under the impression that Agent Ostis was asking him how much he thought someone would be paid to bring a box of cocaine that large into the country, and Alzate had replied that he did not know, but he guessed about $8,000. That was the explanation the defense attempted to get before the jury. It did not succeed in that attempt, for reasons explained below.

### C. The Prosecutor's Representations to the Court and Jury

During cross-examination of Agent Ostis, defense counsel attempted to lay the seeds for Alzate's explanation of the statement about $8,000. He wanted to do so by proving through Agent Ostis himself that there had been another box of cocaine nearby, unrelated to Alzate, and that the two of them had talked about it during the interview. Defense counsel asked Agent Ostis:

Q. Now, on the day in question when you were interviewing Jorge Alzate, there was another arrest made, wasn't there?

A. I don't recall, to be honest.

Q. An individual who came through the airport with a box containing sixteen kilos of cocaine?

Assistant United States Attorney ("AUSA") Richard Boscovich, who was the prosecutor, objected to the question on relevance grounds, and his objection was sustained. Agent Ostis was not allowed to testify whether he remembered having seen an unrelated box of cocaine in the interview room while he was questioning Alzate.

During Alzate's testimony in his own behalf, the defense tried again to tell the jury about the box of cocaine in the room. In discussing the statement he had made to Agent Ostis about the $8,000 figure, Alzate remembered the statement differently than

Agent Ostis did. Alzate testified: "[t]he part where he says that he doesn't remember he must remember, because he himself in my presence opened the box that contained sixteen kilos of cocaine." AUSA Boscovich objected on relevance grounds, and the court sustained the objection. Defense counsel then asked Alzate if he had told Agent Ostis that he received $8,000 for transporting the cocaine, and Alzate testified he had not. Alzate explained to the jury that he and Agent Ostis were having trouble communicating because of the language problem, and that "he showed me this box with the sixteen kilos and he asked me how a person could ...."[1] Before Alzate could complete that answer, Boscovich interrupted with an objection, and the court called the attorneys to a side bar conference.

In the side bar conference, defense counsel told the court Alzate would testify that "Ostis asked him how much would each pound of these things—or he asked him a question with reference to that box of kilos—I mean of cocaine, and his response was I don't know, maybe $8,000." Boscovich stated, "I have an extremely serious problem with his testimony. There was no other seizure that day. What he is doing on that stand, he is fabricating testimony that he said $8,000 because the agent asked him a question as to how much a kilo is." The judge warned defense counsel that Alzate was "doing this at his own peril," and suggested that the government present rebuttal to disprove the testimony. Boscovich assured the judge that he would put Agent Ostis back on the stand in rebuttal to "prove beyond a reasonable doubt that there was no other bust that day." After Boscovich's representation and the court's warning based upon it, defense counsel did not ask Alzate any further questions regarding the interview with Agent Ostis or the box.

During his cross-examination, Boscovich questioned Alzate about the statement regarding the $8,000 payment, and about the box:

---

1. Moments later the interpreter made a correction on the record; Alzate had not said sixteen *kilos* of cocaine, but instead had said sixteen *pounds* of cocaine.

Q. You also testified that Agent Ostis showed you a box, what you characterize as sixteen kilograms of cocaine.

A. I didn't say that either.

Q. You didn't say that on direct examination?

A. No.

Q. But you did say something about that there was a box right in front of you on the table and that the agent asked you questions concerning the box.

A. Yes, I said that he showed me a box with sixteen pounds, not sixteen kilos.

Q. And you testified that he asked you what would be the price of sixteen pounds of cocaine; is that what your testimony was on direct?

A. No, I never said that either.

Q. You didn't say that on direct examination either?

A. No.[2]

Q. And you also didn't testify in direct examination that he asked you, at least you thought he asked you what would be the price of this and you responded $8,000. Wasn't that your testimony on direct? [3]

A. Yes, that's true, but not sixteen pounds.

Q. But you remember now that your testimony was that he asked you something concerning the price of the cocaine.

A. Yes.

Q. But the truth of the matter is that there was no box, sixteen pounds or otherwise, before you when you were being interviewed, isn't that a fact?

A. No, it's a lie. He was taking pictures of that suitcase and right next to it there was a cardboard box about this size and it was tied with a string.

Q. The fact is you were the only person that was arrested or the only seizure that day at the airport. There were no other pieces or articles of luggage in the seizure room.

A. Not inside the room but outside the room, yes.

Q. Okay. So now the box is outside the room. Is that your testimony now?

A. I never said that the box was outside the room. I said that the box was right next to this suitcase. What I'm saying is that there was another person outside. That's what I'm being asked about.

After Alzate's testimony ended, the defense presented its other two witnesses, and court recessed for the evening.

### D. The Truth and the Prosecutor's Decision Not to Disclose It

Meanwhile, Agent Ostis began to wonder about whether in fact there had been another seizure and an unrelated box of cocaine in the vicinity of the interview. To his credit, Agent Ostis checked his records that evening and discovered that there had been another seizure the day of Alzate's arrest, and that there had been a box of cocaine in the room when he interviewed Alzate. The next morning, Agent Ostis told AUSA Boscovich what he had learned.

At that point, there was plenty of time for Boscovich to correct what had been until then his innocent misstatements to the court and to the jury. He learned the truth in the morning, and the trial would not resume until 1:50 p.m. The defense had rested, but the presentation of evidence had not been completed—Boscovich planned to present a rebuttal witness. Boscovich could have informed defense counsel and the court of what he had learned. The matter could have been corrected by stipulation or by testimony from Agent Ostis. The jury could have been told that the box that was an integral part of Alzate's explanation did in truth exist. That

---

2. Alzate's statements that he had not testified that Agent Ostis had asked about the price of that cocaine are true. Boscovich's question was based on what defense counsel had proffered at side bar as to what Alzate would testify to, but Alzate never had an opportunity to give that testimony.

3. Again, that was mentioned during side bar, not on direct, and it is not even an accurate restatement of what defense counsel had said might be Alzate's testimony.

is what should have happened. It did not. The reason matters went awry is that Boscovich, the representative of the Government of the United States in that courtroom, chose to keep silent and not disclose his knowledge that statements he had made to the court and jury were false.

After hearing the truth from Agent Ostis, and deciding not to disclose it, Boscovich called one rebuttal witness. The witness, a customs agent, testified to having read Alzate his *Miranda* rights in Spanish before Agent Ostis took Alzate to the interview room. That was all the evidence Boscovich presented after learning about the existence of the box.

During closing argument, defense counsel emphasized the language barrier between Alzate and Agent Ostis, and offered Alzate's explanation about the statement he had made to Agent Ostis: "You recall Jorge's explanation of the statement. He said that there was another box there with pounds of cocaine in it. There were questions asked about that ...." Boscovich did not mention the subject of the box in his closing argument. On at least eight different occasions during his closing, however, Boscovich argued that Alzate had transported the cocaine for one purpose only: to receive payment of $8,000. Indeed, the alleged statement about $8,000 was central to Boscovich's closing argument, as is evident in his final remarks to the jury:

> Look at the evidence and come to a verdict, that is, verdict from the Latin, to speak the truth, and I submit to you that there is only one verdict: That this man imported cocaine hydrochloride into the United States with one purpose and for one purpose only, to distribute this product up in New York, and he did it for $8,000.

Thus, Boscovich urged the jury to deliver a verdict that spoke the truth, after he himself had chosen not to reveal it.

After the jury had retired to deliberate that afternoon, defense counsel asked Agent Ostis why he had not been called as a rebuttal witness to testify that the box did not exist. Agent Ostis, again to his credit, told

defense counsel the truth, including the fact that he had informed Boscovich about it that morning. Defense counsel confronted Boscovich with what Agent Ostis had told him. At defense counsel's insistence, he and Boscovich brought the matter to the court's attention. At about that point, the jury reached its verdict. The court decided to see what the jury's verdict was, saying that if Alzate was convicted, he could move for a new trial. He was, and he did.

### E. The Motion for a New Trial

In his motion for a new trial, Alzate contended that Boscovich knowingly withheld evidence which would have corroborated Alzate's version of his post-arrest statement, and that because Boscovich's cross-examination had left the jury with the impression that there was no box, his failure to disclose the truth had made the defense position appear to be a fabrication. Thus, Alzate argued, Boscovich violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In his response on behalf of the government to the motion for a new trial, Boscovich stated that Agent Ostis had told him about the box "[a]fter the close of the defense case, but prior to closing arguments."[4] Boscovich argued that Alzate had not established a *Brady* violation, because he did not show that the information about the box was favorable to the defendant or that it was material. Boscovich contended that the information was not favorable because the existence of the box was merely a neutral and collateral matter which would have had little if any corroborative value for Alzate's duress defense. In addition, he argued that if the defense had thought the information was material, it should have reopened its case before the jury returned from deliberation.

After hearing argument, the district court denied the motion for a new trial, stating that "I think this arguably does meet all four prongs [of *Brady*], but on a more rigorous level, I do think that the defense is not able

---

4. That statement is not the whole truth. Boscovich was not just informed "before closing argument," as he put it; he was informed before the close of evidence and before he himself presented a final witness.

and will not be able to demonstrate that this would have had a material effect on the outcome of the case ...."[5] The district court judge explained that she thought Alzate had lost his case when one of his own witnesses testified that he had heard the day before Alzate arrived in the United States that he would be arriving. She noted that this was inconsistent with Alzate's story that he had been unexpectedly kidnapped and forced onto a plane. However, the district court judge did admonish Boscovich before ruling: "I think that the Government cut it a little too close here.... I think it came very close to misleading, going even beyond just not producing the evidence but close to misleading the defense as to the true facts, and I would ask that you never do that again in here, or anywhere else for that matter, Mr. Boscovich." Boscovich explained his conduct to the court by stating that, "Sometimes you make certain determinations at the eleventh hour that, when you have to make a call on the run, sometimes you make a call that might be really close to the line, and I believed that the call I made was right, but I'll be very careful."

### F. Arguments on Appeal

On appeal Alzate argues that Boscovich's knowing failure to disclose the existence of the box prior to the close of evidence denied Alzate his right to a fair trial. Had the existence of the box been disclosed to the jury at trial, Alzate argues, his case would have been strengthened and the prosecution's case would have been weakened. The disclosure of the box's existence would have simultaneously corroborated Alzate's explanation about his interview statement and impeached Agent Ostis's memory of the details surrounding the interview. Alzate contends that the conviction must be overturned if there is a reasonable likelihood that the false

testimony "could have affected the judgment of the jury."

The government is more forthcoming in its brief—which was not written by Boscovich—than it was at trial. The government concedes that Boscovich learned of the existence of the box prior to the presentation of rebuttal evidence and that he took no steps either in rebuttal, or by reopening the government's case, to correct the false impression left by his cross-examination.[6] The government also concedes that Boscovich's inaction was improper, and that his inaction could have led the jury "to question whether appellant had testified truthfully about the box and possibly as to an aspect of his explanation regarding his post-arrest statement to Agent Ostis...." The government further concedes that the materiality standard applicable to this case is not that which applies when favorable evidence has been suppressed, but instead is that which applies when false testimony has been knowingly used. In spite of all of these concessions, the government still argues that Alzate is not entitled to a new trial because, it contends, there was overwhelming evidence of Alzate's guilt.

## II. DISCUSSION

Because of the undisputed facts and the government's concessions in light of those facts, this case comes down to the matter of materiality. Where there has been a suppression of favorable evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the nondisclosed evidence is material: "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S.

---

5. The district court applied the wrong standard. See the discussion *infra* at pp. 1109–10 and n. 7.

6. To the extent that the government would put the burden on the defense to have reopened the case to correct the falsehoods, we reject that argument on the law and the facts. The defense did not make the misstatements; the government did. The defense did not learn that Agent Ostis

had discovered the truth until just moments before the jury announced its verdict; the government knew for hours before the case was even submitted to the jury. Furthermore, it appears from the record that the defense moved for a mistrial as soon as it could. The district court postponed a ruling because the jury was coming back with its verdict.

667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). A different and more defense-friendly standard of materiality applies where the prosecutor knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony. Where either of those events has happened, the falsehood is deemed to be material "if there is any reasonable likelihood that the false testimony *could have* affected the judgment of the jury." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (emphasis added); *accord Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959).[7] As the Supreme Court has held, this standard of materiality is equivalent to the *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), "harmless beyond a reasonable doubt" standard. *Bagley,* 473 U.S. at 679 n. 9, 105 S.Ct. at 3382 n. 9.

The cited decisions deal with false testimony. We do not have that in this case. Instead, we have explicit factual representations by the prosecutor at a side bar and implicit factual representations to the jury during cross-examination of the defendant.[8] However, the reason the lower materiality burden applies where there is knowing use of perjured testimony is that such a situation involves prosecutorial misconduct and a corruption of the truth-seeking function of the trial. *Id.* at 680, 105 S.Ct. at 3382; *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2397. This case involves prosecutorial misconduct and a corruption of the truth-seeking function as well, albeit through somewhat different means. Accordingly, we agree with the government's concession that the *Napue/Giglio* materiality standard is the proper one for this case. We turn now to an application of that standard to the facts.

■ Much of the government's argument about the weight of the evidence against Alzate misses the mark, because it concerns proof that he knowingly possessed and imported cocaine. That is not where the line of contention was drawn at trial, and it is not where our materiality focus should be. The issue at trial, and the only issue, was Alzate's duress defense. Agent Ostis's testimony about the statement Alzate made while being interviewed did serious damage to the duress defense. The damaging nature of Agent Ostis's testimony about that statement is evident from the fact that Boscovich referred to it eight times in his closing argument to the jury. Alzate's attempt to repair that damage and salvage his only defense by explaining the statement was seriously undermined by the representations AUSA Boscovich made to the court and the jury—representations which Boscovich later learned were false. If Boscovich had disclosed the truth when he learned it, the truth would have corroborated Alzate's explanation about the statement and shown that Agent Ostis, though honest, had a less-than-perfect memory. Under these circumstances, we conclude that Boscovich's failure to correct his misstatements after he learned that that is what they were could have affected the jury's verdict. Stated somewhat differently, we conclude that the prosecutorial misconduct was not harmless beyond a reasonable doubt in this case.

It may be that Alzate's duress defense does not amount to much, but he is entitled to put his defense forward free of the prosecutorial misconduct that occurred in this case. *See United States v. Nash,* 910 F.2d 749, 759 (11th Cir.1990) (Hill, J., dissenting) ("In the eyes of many, that defense rested on a slender reed indeed, but that reed was all that [the defendant] had to sustain him."). It may be that Alzate will be convicted after a

---

7. We note that in denying Alzate's motion for a new trial, the district court applied the "reasonable probability of a different result" standard. That materiality standard is substantially more difficult for a defendant to meet than the "could have affected" standard we apply—a standard which the government now concedes is the applicable one. Had the government made the same concession in the district court, this appeal might not have been necessary.

8. At least one of the representations Boscovich made while cross-examining Alzate was explicit: "The fact is you were the only person that was arrested or the only seizure that day at the airport. There were no other pieces or articles of luggage in the seizure room."

fair trial. We do not know, but we do know that he has not yet had one.

## III. CONCLUSION

We REVERSE the district court's order denying Alzate's motion for a new trial and REMAND for a new trial.