**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**David Carlton ARNOLD, Armando Coto, Defendants–Appellants.**

Nos. 93–4713, 95–4649.

United States Court of Appeals,
Eleventh Circuit.

July 25, 1997.

Bruce Rogow, Beverly Pohl, Ft. Lauderdale, FL, Kenneth M. Swartz, Asst. Federal Public Defender, Miami, FL, for Defendants–Appellants in No. 95–4649.

Dawn Bowen, U.S. Attorney, Stacey Levine, Lisa Rubio, Miami, FL, for Plaintiff–Appellee in No. 95–4649.

Michael Tarre, Coral Gables, FL, Bruce Rogow, Beverly A. Pohl, Ft. Lauderdale, FL, for Defendant–Appellant Arnold in No. 93–4713.

Kenneth M. Swartz, Asst. Federal Public Defender, Miami, FL, for Defendant–Appellant Coto in No. 93–4713.

William Keefer, U.S. Attorney, Dawn Bowen, Stacey Levine, Lisa Rubio, Miami, FL, for Plaintiff–Appellee in No. 93–4713.

Before HATCHETT, Chief Judge, BARKETT, Circuit Judge, and FAY, Senior Circuit Judge.

HATCHETT, Chief Judge:

Appellants, David C. Arnold and Armando Coto, appeal their convictions and sentences arising from their participation in a drug conspiracy. Arnold and Coto were tried together before a jury and convicted on Count I for conspiracy to distribute marijuana. The jury also convicted Arnold on three counts of money laundering and two counts of interstate travel in aid of racketeering. Appellants contend that the statute of limitations barred their prosecution, and therefore conviction, on the conspiracy count. In addition, appellants contend that they are entitled to a new trial based on the government's violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We affirm the district court's determination that the statute of limitations did not bar prosecution on the conspiracy count, and reverse the appellants' convictions on the *Brady* claim and remand for a new trial.[1]

## BACKGROUND

### A. *The District Court Proceedings*

On November 5, 1991, a federal grand jury in the Southern District of Florida indicted

---

1. The appellants also raise other issues relating to their convictions and sentences. Specifically, appellants contend that: (1) the evidence was insufficient to support the conspiracy convictions; (2) the trial court erred in failing to instruct the jury of the appellants' statute of limitations defense; (3) because the conspiracy ended prior to November 1, 1987, the district court erred in applying the Sentencing Guidelines; and (4) the district court erred in including the entire shipment of marijuana to determine the base offense level under the Sentencing Guidelines. Additionally, Arnold contends that his money laundering and Travel Act violations should be reversed based on insufficiency of the evidence, evidentiary errors and the impermissible destruction of exculpatory evidence. Because we remand this case for a new trial, we do not address these issues.

Arnold for money laundering in violation of 18 U.S.C. § 1957(a). A March 31, 1992 superseding indictment charged Arnold and Coto with conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count I). That indictment also charged Arnold with three counts of money laundering in violation of 18 U.S.C. §§ 1957(a) and 2, and two counts of interstate travel in aid of racketeering in violation of 18 U.S.C. §§ 1952 and 2. In September 1992, the prosecution informed the appellants that a romantic affair had occurred between Internal Revenue Service (IRS) case agent Synda Smith and lead government witness Charles Goldman. At this time, the prosecution also disclosed the existence of telephone calls between Smith and Goldman that officials at the Metropolitan Correctional Center (MCC), where Goldman was being held, had taped. In October 1992, appellants filed motions to dismiss the indictment based on government misconduct and a statute of limitations violation. Appellants also requested access to the tapes. At a hearing on December 1, 1992, the district court denied the appellants access to the tapes, relying on the government's assertion that the tapes contained no discoverable material, and denied the motions to dismiss. The subsequent jury trial ended in a mistrial when the jury could not reach a verdict.

The government retried the appellants in February 1993.[2] The jury in the second trial found the appellants guilty on all counts. After appellants were sentenced, the government inadvertently sent Arnold's lawyer some of the transcripts of the taped conversations between Smith and Goldman. Thereafter, the appellants moved for a new trial on the ground that the tapes contained favorable material that should have been disclosed to the defense. After an *in camera* review of the tapes, the district court ordered the prosecution to grant the defense access to the tapes and transcripts for inspection.

On March 25, 1995, the court held a hearing on the motion for a new trial. On May 10, 1995, the court signed an order, which the prosecution alone prepared, denying the mo-

tion on the ground that the appellants had failed to show that a reasonable probability existed that had the taped conversations been disclosed, the outcome of the trial would have been different. In other words, the district court held that the appellants had failed to satisfy the final prong of the *Brady* test. Appellants filed the instant appeal.

### B. *The Conspiracy*

In 1979, government witness Charles Goldman became a client of Arnold's. As Goldman's attorney, Arnold assisted Goldman in his divorce, the sale of his floor covering business, traffic ticket difficulties, and his arrest for possession of marijuana. From approximately 1980, Goldman derived all of his income from the marijuana business. In 1981, Goldman met and began distributing marijuana for Acqulino Melo, who received large quantities of marijuana from Colombian suppliers. Goldman eventually became Melo's main distributor in the United States.

Goldman testified that he had discussed his marijuana business with Arnold numerous times since 1981. Additionally, Helen Leith, Goldman's mother, testified that some time between 1982 and 1986, she accompanied Goldman to Arnold's office and heard Arnold and Goldman discussing a marijuana shipment. When Goldman started accumulating money from the marijuana business, Arnold handled Goldman's financial matters through a client trust account as well as various other accounts established on Goldman's behalf.

On May 31, 1985, Goldman's largest project with the Melo organization occurred, the off-loading of approximately 45,000 pounds of marijuana in Oregon from a boat named the "Saja." Goldman called Arnold several times from Oregon to discuss the Saja shipment, particularly the sale of the fish cargo that was used to disguise the marijuana. Goldman's associate, William Rego, weighed and counted the marijuana, and helped Goldman collect the proceeds. The marijuana was distributed before June 1985, and Goldman had collected the money from the distributors before January 1986. Because Goldman

---

**2.** The appellants preserved their statute of limitations claim during the second trial through motions for judgment of acquittal and for a new trial.

was a heavy drinker and drug user, Melo sent Armando Coto, his alleged "enforcer," to Goldman's residence to ensure that Goldman collected the remainder of the money.[3] Melo instructed Goldman to pay Coto $75,000 in cash for Coto's services. Goldman earned between $350,000 and $400,000 from the Saja importation, and left some of this money with his mother and some with Arnold. Goldman made approximately $5 million in total while working for the Melo organization.

In the mid–1980s, Arnold was involved in numerous real estate transactions on Goldman's behalf in Miami and California, including titling certain properties in the names of Goldman's relatives and associates so as to disguise the identity of Goldman as the true owner. Goldman paid Arnold a six-percent commission for handling the sale of one of Goldman's houses because of Arnold's knowledge that drug proceeds were involved in the property. Arnold also handled the legal work for Goldman's purchase of at least five luxury cars and ten to twelve smaller cars with drug proceeds. Arnold titled the cars and paid for any expenses out of the trust account or other checking accounts that he maintained for Goldman. Additionally, Arnold assisted Goldman in forming the Hangman Productions Company, a legitimate albeit unsuccessful business that Goldman used to hide his drug proceeds.

When coconspirator Rego wanted to purchase a boat with his drug earnings from the Saja importation, Goldman instructed him not to spend more than $10,000 at a time on the boat in order to avoid scrutiny from the IRS. Rego hired Arnold to make the payments to the yacht broker. Arnold made three initial payments of $9,000 each, and wired the balance to the yacht broker.

In June 1986, after giving Arnold a power of attorney, Goldman fled to France because he feared the Saja importation was under investigation. Goldman instructed Arnold to begin liquidating his assets. After leaving the country, Goldman ended his participation in the marijuana business or in any criminal activity. From July 1986 to October 1989, Arnold visited Goldman approximately eighteen to twenty times in both France and the Philippines.[4] On one particular trip to visit Goldman in the Philippines, Arnold brought Goldman's inventory sheets from the Saja shipment; they noted which persons were responsible for distributing and collecting the money for certain amounts of marijuana. Arnold had kept these notes for Goldman for safekeeping when Goldman left the United States. Additionally, to facilitate Goldman's flight, Arnold assisted in arranging to have Goldman's furniture and luxury cars shipped to him in France.

Arnold shipped the first cars to Goldman in mid to late 1986. The French government seized five of the cars upon arrival. Because the cars were titled in the names of various individuals or corporations, Arnold had to obtain powers of attorney in order to retrieve them from French customs officials. Arnold then arranged the sale of the cars to the French government for a total of $20,000, even though the cars together were worth over $100,000. On October 10, 1989, the money was wired from Geneva, Switzerland, to Arnold's office in Florida. Goldman testified that he only received $6,000 and was unaware of what happened to the remainder. On October 31, 1989, Arnold wired a portion of the sale proceeds to Goldman's wife in Portland, Oregon.

In July 1986, Arnold traveled to France to introduce Carl Regan to Goldman. Regan was a potential business partner for Goldman's prospective arms business. Both Arnold and Regan carried $50,000 in cash on their persons to Goldman without declaring the money per customs regulations.[5] Goldman and Arnold thereafter traveled to Geneva to form two Panamanian corporations, open bank accounts and establish trusts—all to conceal Goldman's identity as the owner because they involved Goldman's earnings from the Saja importation. Goldman financed his business ventures in arms and

---

**3.** The total amount collected for the Saja shipment was approximately $11.4 million.

**4.** Goldman testified that he was in the Philippines on a permanent basis as of January 1987.

**.5.** Goldman had instructed Leith to deliver the $100,000 to Arnold, which she did.

bus sales through these corporations. Coto eventually became a sales director of the arms corporation, Pentagram, working with both Goldman and Arnold.

Also in July 1986, Rego gave Arnold a power of attorney and fled the United States to join Goldman in France. In November 1986, Arnold sold Rego's boat and deposited the sale proceeds in a trust account. A month later, Arnold wired the money to Goldman in the Philippines.

In mid to late 1987, Coto went to visit Goldman in the Philippines. Goldman testified that they discussed how to handle the grand jury investigations and pending arrests for the Saja importation. Coto also informed Goldman that the government had seized a boat carrying 100,000 pounds of marijuana belonging to the Melo organization off the coast of Seattle, Washington. In addition, Goldman spoke with one of his previous distributors, Steven Becker, and Becker told Goldman that he had participated in a 50,000 pound marijuana importation with the Melo organization in West Palm Beach in 1987.

Another participant in the Saja importation was a disbarred lawyer, Arthur Brodsky. While serving his sentence for an unrelated offense, Brodsky became a suspect in the Saja affair. In fear of Brodsky's revealing damaging information, Melo instructed Goldman to prevent Brodsky from cooperating with the government. Goldman thus directed that Arnold hire lawyers for Brodsky, give money to Brodsky's wife and inform Brodsky that Coto would endanger Brodsky's life if he cooperated with the government. When Goldman expressed to Melo his need of assistance in making these payments, Coto delivered $15,000 to Arnold from Melo. In February 1987, Brodsky entered into a plea agreement with the government and a month later, while incarcerated, began recording his conversations with Arnold. Brodsky testified that he had warned Arnold to avoid Goldman and had informed Arnold that Goldman was a marijuana dealer.

In June 1988, a grand jury indicted Goldman for his participation in the Saja importation. The same month, Goldman began negotiating his return to the United States, which included his cooperation with the government. He eventually pleaded guilty to a racketeering count in Massachusetts, as well as one count of importation and one count of distributing the marijuana shipment of the Saja in Oregon. The Oregon court sentenced Goldman to fifteen years of imprisonment, which was reduced to twelve years for his initial cooperation with the government, and three years of special parole.[6] In September 1990, Goldman signed a statement to government agents concerning the appellants' participation in the conspiracy.

### C. The Tapes

IRS Special Agent Synda Smith became a case agent for the Arnold investigation in July or August 1991. Thereafter, Smith met with Goldman professionally on numerous occasions in connection with the investigation. In January 1992, the relationship between Smith and Goldman turned personal, and two months later, the two became sexually intimate. On May 13, 1992, after someone from the MCC reported seeing Smith kiss Goldman, Smith's supervisor removed her from the Arnold investigation and instructed her to have no further contact with Goldman. Telephone conversations between Smith and Goldman were recorded while Goldman was incarcerated at the MCC.

The taped conversations between Smith and Goldman include discussions of: (1) Goldman's expectations of a sentence reduction of five years or for a total five-year sentence in exchange for his cooperation in the present case; (2) Goldman's assisting the government in the investigations of Coto's home and business for the purpose of government seizure; (3) Goldman's desire to be transferred and resentenced (with the sentence reduction) in Miami; (4) Smith's conversations with Leith, Goldman's mother, and impressions of Leith as "incoherent"; (5)

---

**6.** Six to seven months after Goldman's testimony in this case, the government filed a motion pursuant to Federal Rule of Criminal Procedure 35, recommending a reduction of sentence on Gold-

man's behalf. In response, the Oregon court reduced Goldman's sentence to six years and nine months of imprisonment. Goldman was released from prison in November 1993.

Smith's views of Goldman as a manipulator; and (6) Smith's concerns that Goldman was getting his information from discovery documents rather than from his own memory. In addition, Smith discussed Goldman's desired sentence reduction with the Assistant United States Attorney (AUSA) assigned to the Arnold investigation, and assured Goldman that he would get the reduction. The substance of those conversations is contrary to Goldman's testimony during the appellants' second trial.

At that trial, Goldman testified that he had *no expectations concerning a sentence reduction*, other than that the AUSA would describe his cooperation to the sentencing judge in Oregon, and that the government had made no promises to him of a sentence reduction. Goldman also down-played the number of conversations he had with Smith concerning the Arnold and Coto investigations. Additionally, Leith testified before the jury as one of the government's primary witnesses.

## ISSUES

We discuss two issues in this case: (1) whether the statute of limitations barred the prosecution of the appellants on Count I for conspiracy to distribute marijuana; and (2) whether the appellants are entitled to a new trial on the ground that the contents of the taped conversations between Smith and Goldman should have been disclosed to the defense prior to trial pursuant to the standards set forth in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny.

## DISCUSSION

A. *Statute of Limitations on the Conspiracy Charge*

■ The statute of limitations for a conspiracy charged pursuant to 21 U.S.C. § 846 is five years. 18 U.S.C. § 3282 (1988). The existence of a section 846 conspiracy, however, does not require the government to prove an overt act. *United States v. Terzado–Madruga*, 897 F.2d 1099, 1121 (11th Cir. 1990). The government satisfies the requirements of the statute of limitations for a non-

overt act conspiracy if it alleges and proves that the conspiracy continued into the limitations period. *United States v. Coia*, 719 F.2d 1120, 1124 (11th Cir.1983), *cert. denied*, 466 U.S. 973, 104 S.Ct. 2349, 80 L.Ed.2d 822 (1984). The government need only prove, through direct or circumstantial evidence, that: (1) a conspiracy existed; (2) the defendant knew of the conspiracy; and (3) with knowledge, the defendant became a part of the conspiracy. *Terzado–Madruga*, 897 F.2d at 1121. Finally, a conspiracy is deemed to continue as long as its purposes have neither been abandoned nor accomplished, and no affirmative showing has been made that it has terminated. *Coia*, 719 F.2d at 1124, 1125.

■ The appellants contend that the statute of limitations barred the prosecution on the Count I conspiracy charge because the marijuana distribution conspiracy ended in January 1986, when all of the marijuana had been distributed, the money collected and the participants paid. Accordingly, appellants contend, the limitations period expired in January 1991, and thus the government's March 31, 1992 indictment fell outside of the limitations period. The appellants argue that Goldman's leaving the country and Arnold's transfer of Goldman's money to European accounts did not advance or extend the conspiracy. In addition, they allege that payments to silence Brodsky were not in furtherance of the conspiracy and occurred after the conspiracy had ended.

The government responds that the scope of the conspiracy included acts of money laundering and concealment occurring after April 1987, bringing the indictment within the limitations period. The government argues that the appellants' participation in attempting to ensure the silence of Brodsky was in furtherance of the conspiracy and allowed the Melo organization to maintain its operations. In addition, Arnold furthered the conspiracy in handling Goldman's monetary transactions—which included wiring and delivering large sums of money, selling cars and sending furniture to Europe—while Goldman was fleeing possible indictment. These actions aided and abetted the conspir-

acy and also allowed the Melo organization to stay in business.

Upon reviewing the evidence in this case, we conclude that the conspiracy lasted well within the statute of limitations period, and therefore the prosecution of the appellants was timely. We have held that a person only involved in the money laundering portion of a conspiracy to distribute cocaine and marijuana can be found to have been a part of the conspiracy to distribute the controlled substances. *See United States v. Bolinger,* 796 F.2d 1394, 1407–08 (11th Cir.1986), *modified on other grounds,* 837 F.2d 436 (11th Cir.), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988). Because "it is in the nature of large scale drug dealings that means will be needed to conceal the source of considerable illegal proceeds," we found laundering to be an integral part of the conspiracy. *Bolinger,* 796 F.2d at 1408. In so holding, we rejected the defendant's argument that a separate conspiracy for money laundering existed in addition to the distribution conspiracy. *Bolinger,* 796 F.2d at 1407.

As in *Bolinger,* the common objective in the instant case was to distribute marijuana "for the financial benefit of the participants." 796 F.2d at 1407. Arnold began managing Goldman's drug proceeds through various monetary accounts in the mid–1980s. He assisted Goldman in purchasing and selling cars and real estate with illegal earnings, and negotiated the sale of Goldman's cars to the French government as late as 1989. In addition, Arnold helped Goldman form two foreign corporations to hide the source of Goldman's income. Arnold also helped coconspirator Rego purchase a boat with his drug proceeds, as well as later sell the boat after Rego fled the country to join Goldman. Throughout Goldman's absence from the United States, Arnold wired and personally transported money to Goldman from his client trust account. Arnold was instrumental in laundering the drug money of two of the main conspirators during and in furtherance of the conspiracy, thus extending the conspiracy into the limitations period.

In 1989, both Arnold and Coto participated in trying to silence Brodsky based on instructions from Goldman and the Melo organiza-

tion. The Supreme Court has held that acts of concealment are not part of the original conspiracy. *See Grunewald v. United States,* 353 U.S. 391, 402, 77 S.Ct. 963, 972, 1 L.Ed.2d 931 (1957). Acts of concealment that allow an organization to stay in business, however, can be in furtherance of a conspiracy. *Grunewald,* 353 U.S. at 406 n. 20, 77 S.Ct. at 974; *cf. United States v. Knowles,* 66 F.3d 1146 (11th Cir.1995) (attorney helping client obtain payment for client's participation in drug importation occurred within the pendency of the conspiracy and was not mere concealment), *cert. denied,* —— U.S. ——, 116 S.Ct. 1449, 134 L.Ed.2d 568 (1996). The appellants' attempts to silence Brodsky allowed the Melo organization to maintain its operations. Goldman testified that he was aware of two Melo importations into the United States (one off the coast of Washington and one in West Palm Beach) after the Saja importation, which was Goldman's eighth shipment with the Melos.

Finally, in *United States v. Gonzalez,* 921 F.2d 1530, 1548 (11th Cir.), *cert. denied,* 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 68, *and cert. denied,* 502 U.S. 860, 112 S.Ct. 178, 116 L.Ed.2d 140 (1991), we concluded that a conspiracy was deemed to continue into the statute of limitations period based on the facts that: (1) the majority of members remained at large and continued to associate together; (2) some of the same conspirators participated in another cocaine importation; (3) the alibis of two coconspirators matched; and (4) discussions occurred amongst the members regarding payment for a botched shipment of contraband. In finding that the conspiracy extended into the limitations period, we relied on this court's opinion in *United States v. Corona,* 885 F.2d 766 (11th Cir.1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1838, 108 L.Ed.2d 966 (1990). In *Corona,* we held that a drug "enterprise" for purposes of the Travel Act, 18 U.S.C. § 1952(a)(1), was extended when the "organizational kingpin assumed a false identity and remained a fugitive, liquidating and living off his earlier illegal earnings with the knowing assistance of his money launderer and banker, both of whom had previously facilitated either the laundering or distribution of the proceeds of the kingpin's

marijuana earnings." 885 F.2d at 772. The facts of the present case are analogous.

Here, Goldman, the Melo organization's main marijuana distributor, fled the United States in fear of the pending Saja investigation with the help of his money launderer, Arnold. He lived off of his prior illegal drug proceeds, and kept in contact with coconspirators Rego, Coto and Becker. Coto even went to visit Goldman in the Philippines, where they discussed how to respond to the Saja investigation and pending arrests. Finally, Goldman testified about the Melo organization's continuing operation with at least two more drug shipments of which he was aware. Accordingly, we conclude that the conspiracy extended past April 1, 1987, and into the statute of limitations period.

### B. *The Brady Claim Regarding the Taped Conversations*

The next issue we address is whether the appellants are entitled to a new trial based on the government's suppression of taped conversations between primary government witness Goldman and IRS Special Agent Smith in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ In order for the appellants to establish that the government has violated *Brady,* they must show that: (1) the government possessed evidence, including impeachment evidence, favorable to the defense; (2) they did not possess the evidence nor could have obtained it with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the trial outcome would have been different, *i.e.,* the evidence was material. *Mills v. Singletary,* 63 F.3d 999, 1014 (11th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1837, 134 L.Ed.2d 940 (1996); *United States v. Blasco,* 702 F.2d 1315, 1327 (11th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 275, 78 L.Ed.2d 256 (1983). A "reasonable probability" is one sufficient to undermine confidence in the trial outcome. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). The standard of materiality is less stringent, however, when the prosecutor knowingly uses per-

jured testimony or fails to correct testimony he or she learns to be false. *United States v. Alzate,* 47 F.3d 1103, 1110 (11th Cir.1995). In that instance, the falsehood is deemed material if a "reasonable likelihood" exists that the false testimony could have affected the jury's verdict. *Alzate,* 47 F.3d at 1110; *Blasco,* 702 F.2d at 1328.

■ The appellants contend the government suppressed evidence favorable to the defense in violation of *Brady* and *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), warranting a new trial. They argue that because the prosecution had access to taped conversations between Goldman and Smith, which contained information that the prosecution knew to contradict Goldman's trial testimony, the appellants need only show a reasonable likelihood, rather than the more stringent "reasonable probability," that the outcome of the trial would have been different. They assert, however, that they have met their burden under either standard.

The government counters that the tapes do not contain *Brady* material, but, if anything, mere cumulative impeachment evidence. In addition, the government argues that it did not present any perjured or false testimony and that the appellants have not shown that the outcome of the trial would have been different. The government states that defense counsel thoroughly cross-examined Goldman, impeached him with prior testimony and questioned him about his affair with Smith.

We find that the taped conversations constitute *Brady* material which should have been turned over to the defense. While being cross-examined at trial, Goldman denied any expectation of a reduced sentence as a result of his cooperation. Goldman also down-played his desire for assistance from Smith, as well as the extent of their conversations about the Arnold investigation. The tapes, however, contradict Goldman's testimony. For example, during one conversation the following colloquy occurred:

> SS [Smith]: You're gonna get some credit for this.
>
> CG [Goldman]: I want big-time credit.

SS: *You are, you're gonna get it.*

. . . .

CG: Listen. I don't want money, you know what I mean? I wanna get out of prison. And I want to, listen to me. I just wanna get ... I wanna get the special parole knocked off under Rule 35, the government asks for it if possible. The balance of parole whatever, a couple of months to a year I got, I want it amended so I can continue working. I want back my passport. I wanna work hand in hand every day with your group over here, okay? ...

(Emphasis added.) In another conversation, Goldman told Smith:

CG: ... I'm counting on [AUSA] Allen to take the whole picture and he's the one ... I want him to go into court for me and battle and say, "Okay, we wanna get Goldman five years. This is what he's done.", and give him blah-blah-blah, you know, the whole thing. You know what I'm saying? I mean, I'm giving ... I'm giving more assistance and I don't know anybody who's putting together ... I mean, I wasn't involved in all this but look what I'm organizing already. You know what I'm saying? I just wanna get out. . . .

The tapes also contain implications that the government did make Goldman promises of a sentence reduction.

SS: Okay, uh, *Jim said that he and [AUSA] Allen told you five years off your sentence.*

CG: Right.

SS: And that *Jim said that you could hold him to that.*

. . . .

CG: Yeah. No, but see, the last time when he was talking about the five, we thought that they meant a five-year recommendation. The last one was six, you know what I'm saying?

(Emphasis added.) Two days later, Smith and Goldman continued speaking of a sentence reduction:

SS: Yeah. I mean, *I thought he was gonna give you five years off versus five-year sentence, so that's good.*

CG: Yeah. We've just gotta produce. I hope everything just goes to trial and this thing gets over. You know.

SS: I think it will.

(Emphasis added.)

Moreover, the government doubted the ability of Goldman, as well as that of government witness Rego, to recall information about the conspiracy from his independent memory.

SS: You know, its, but it's a real concern of ours. 'Cause what ... do these people know the stuff—you know, all our witnesses, whether they know it because it's fact or they know it because they've read it for years and years and years—which is a problem with you too, in a way. I mean, you have seen all the discovery, and you know all this stuff people have said, and now do you remember what you remember because you remember or because you read it?

The government also doubted Goldman's veracity. Smith even told Goldman she thought she was the "only idiot" who believed him, and that "[e]veryone else thinks [he made] up" his information. Additionally, the prosecution was hesitant to let Goldman sign summaries of his testimony, as evidenced in the following conversation:

SS: So, I'm just finishing typing up your thing. We're coming down to MCC tomorrow.

CG: Do you want me to sign it?

SS: After my meeting with Lang.

CG: Right. Well you can let me sign it and then you can—

SS: He doesn't wanna—

CG: He doesn't want—

SS: He doesn't want you ... *he wants them to be my summaries of what you did so that you're not bound to that*—you won't say she must've misunderstood me (inaudible).

CG: Oh. Sneaky, sneaky pooh. So you'll sign 'em? You'll sign 'em?

(Emphasis added.) Finally, the transcripts are replete with conversations between

Smith and Goldman concerning the Arnold case in general, including updates from Smith of how the investigations were progressing.

Smith also had conversations with the AUSA about Goldman's sentence reduction, and assured Goldman that the AUSA would do anything Goldman wanted because Goldman was the "star witness." Moreover, in the taped conversations Smith encouraged Goldman to "make it seem like drugs was [sic] the biggest part" of a kidnaping arrest against which Arnold represented Goldman. In addition, Smith found Leith "incoherent," and the tapes contain conversations implicating that Smith possibly coached Leith's testimony.[7] Finally, Smith testified at the hearing for the motion for a new trial that between November 1991 and April or May 1992 no one spent more time with Goldman concerning the Arnold investigation than she did.[8] In his closing arguments, however, the prosecutor stated that "there was not a woman in the world who was involved in this case." The prosecutor also directed the jury's attention to Leith's credibility.

The district court found that the appellants had failed to establish a reasonable probability that, had the taped conversations been disclosed to the defense, the outcome of the trial would have been different.[9] The court did not apply the "reasonable likelihood" standard because it found that the prosecutor had not possessed the transcripts of the tapes at the time of trial, and therefore was without knowledge of any perjured or false testimony. The court clearly erred in making this finding since the government did possess the transcripts at the time of trial, as the government rightly concedes on appeal.

We conclude that the district court abused its discretion in denying the appellants' motion for a new trial because the appellants have demonstrated a Brady violation. See United States v. Cox, 995 F.2d 1041, 1044 (11th Cir.1993) (denial of motion for a new trial is reviewed for abuse of discretion). An analysis of the taped conversations provides favorable evidence to the defense, in terms of impeachment evidence and contradictions of the trial testimony of the government's key witness. See Ogle v. Estelle, 641 F.2d 1122, 1125 (5th Cir. Unit A Apr. 1981) (Brady violation found because suppressed Federal Bureau of Investigation reports contained favorable impeachment evidence). The tapes contain numerous examples of Goldman's desires for, and belief that he received a promise of, a sentence reduction in return for his cooperation in this case. In addition, Smith's doubts of the veracity of two government witnesses are recorded. Agent Smith also described Leith as "incoherent" and Goldman as a manipulator. All of this evidence is favorable to the defense. Goldman and Leith were two of the governments primary witnesses, and the prosecutor denied that Smith was even involved in the case.

Next, the appellants did not possess the evidence nor could they have obtained it with reasonable diligence. The tapes were in the possession of the government, and the government chose to suppress them. Therefore, the second and third prongs of Brady are met. The final criterion is the materiality of the evidence at issue. The question is whether a reasonable likelihood exists that had the evidence been disclosed to the de-

---

7. An example of the possible coaching of Leith is evidenced in the following conversation:

> CG: Sometimes she's just that way. I had a lot of problems with her after my dad died. It's kinda like a little bit of early senility.
> SS: Not senility, really, is it. How old is she.
> CG: When she's tired—she's almost 80—but when she's tired or stressed, you know what I'm saying?, you know, you gotta get her and you gotta keep her—
> SS: Well this morning she was a lot better, but yesterday it was, like, *so hard to make her understand what I wanted and what I wanted to do.*

(Emphasis added.)

8. In one taped conversation between Smith and Goldman, the following transpired:

> SS: Pretty soon, they're gonna come to me, and they're gonna go, "Synda [Smith], do you realize you've had a hundred and forty-seven thousand phone calls from the jail?" "Wow!"
> CG: A hundred and forty-six thousand nine hundred and fifty over from Goldman.
> SS: All of 'em were.

9. The district court did not address whether the appellants had established the first three prongs of Brady.

fense, the trial outcome would have been different.

As outlined above, the tapes contain examples of statements from Goldman that are contrary to his trial testimony. Goldman testified that he had no expectation of a sentence reduction in return for cooperating with the government. On tape is a conversation where Goldman discussed his expectation of a five-year reduction of his twelve-year sentence or a five-year sentence. In addition, illustrations of Goldman's merely "performing" for the prosecution are on the tapes. Smith even expressed concern that Goldman possibly tailored his testimony by virtue of all of the reports that he had read. She stated that the prosecutor did not want Goldman to sign summaries of his testimony so that Goldman would not later be held accountable for them. Finally, the taped conversation between Smith and Goldman discussing Leith's coherency can be interpreted as implicating that Smith coached Leith's testimony.

Goldman and Leith were two of the government's primary witnesses, and Smith was never called to testify. Arnold's defense counsel testified at the hearing on the motion for a new trial that if he had possessed the tapes, he would have called Smith to the stand. In addition, in his closing arguments the prosecutor emphasized to the jury that no women were involved in the investigation of this case. Finally, this case was a close one; indeed, the first trial ended in a hung jury.

Based on the above, we conclude that a reasonable likelihood existed that the taped conversations could have affected the judgment of the jury.[10] Accordingly, the appellants are entitled to a new trial.

## CONCLUSION

Because we find that the conspiracy extended into 1989, we affirm the district court's determination that the statute of limitations did not bar prosecution of the appellants for the conspiracy charge. In addition, because we conclude that the government violated the principles of *Brady v. Maryland*,

we reverse the district court's denial of the appellants' motion for a new trial. We remand this case for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

---

**10.** We would reach the same result under the "reasonable probability" standard of *Brady*.